WO

JL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| Dimitri Rozenman, | No. CV 18-00222-TUC-RM |
|---|---|
| Plaintiff, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Dimitri Rozenman, who is currently confined in the Arizona State Prison Complex-Tucson, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendant Mattos moves for summary judgment. (Doc. 16.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 20), and he opposes the Motion. (Doc. 30.) Plaintiff has filed a Motion to Amend his Complaint (Doc. 34), to which Defendant has responded (Doc. 35).

The Court will deny Defendant's Motion for Summary Judgment and grant Plaintiff's Motion to Amend.

**I.     Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a claim in Count One against Defendant Mattos and directed him to answer the claim. (Doc. 8.) The Court dismissed the remaining claims and Defendants. (*Id.*)

. . . .

**II.      Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

. . . .

. . . .

. . . .

**III. Facts**

    **A. ADC's Drug Testing Policy**

ADC Department Order (DO) 709 governs substance abuse and provides for substance abuse prevention and interdiction tactics, as well as disciplinary actions for inmates who violate rules related to illegal alcohol and substance abuse. (Doc. 17 at 1 ¶ 1.)[1] Inmates housed in institutions and correctional release centers are charged with the appropriate disciplinary rule violation when: (1) they produce a urine specimen which tests positive for illegal drugs or alcohol; (2) they are found in possession of illegal drugs, drugs not legally prescribed, or alcohol; (3) they are involved in smuggling illegal substances or alcohol; or (4) they disobey a direct order from staff by refusing or failing to produce a urine specimen. (*Id.* ¶ 2.) Disciplinary sanctions are imposed for all violations resulting in guilty findings. (*Id.*)

Inmates are urinalysis ("UA") tested on a random basis. (*Id.* ¶ 3.) When an inmate either refuses a UA, tests positive, or fails to produce a sample, he is tested on a targeted basis for three months. (*Id.*) At the end of three months, the inmate is placed back on random testing. (*Id.*) There is no provision in DO 709 for methods other than urinalysis for testing for illegal substances. (*Id.* ¶ 4.)

    **B. ADC's Disciplinary Procedures**

Disciplinary sanctions applicable to inmates found guilty of a 38B violation, "positive test or refusal of UA," are set forth in DO 803, Inmate Discipline System. (*Id.* ¶ 5.) Sanctions include loss of privileges, such as contact visitation; loss of earned release credits; restitution; extra duty hours; or placement in non-earning parole class III. (*Id.*) Disciplinary sanctions are determined by the Disciplinary Hearing Officer, who hears the case and renders a decision. (*Id.* ¶ 8.) Following each hearing conducted by a Disciplinary Hearing Officer, the unit Deputy Warden performs an administrative review of the documentation. (*Id.* ¶ 9.) If the inmate appeals a disciplinary finding, "the focus of the

---

[1] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

review is whether the inmate was afforded due process, whether there was adequate proof, whether the case was appropriately charged, and whether penalties were properly assessed." (*Id.* ¶ 10.)

### C. Plaintiff's Disciplinary Proceedings

Plaintiff has been assigned to the Santa Rita Unit since July 2015. (*Id.* ¶ 6.) Plaintiff has received four disciplinary tickets for "positive test or refusal of UA" since his arrival at the Santa Rita Unit. (*Id.* ¶ 7; Doc. 17-1 at 50.) Plaintiff has not received any new disciplinary tickets since May 2018. (Doc. 17 ¶ 12.)

#### 1. March 30, 2017 Disciplinary Ticket

On March 30, 2017, Sergeant Coleman filed an Inmate Disciplinary Report because Plaintiff had failed to produce a urine sample within two hours. (Doc. 17-1 at 52.) Officer Luke verbally placed Plaintiff on report, and Sergeant Coleman wrote the report. (*Id.*) Officer Barraza investigated the charge and referred it to the Disciplinary Hearing Officer as a felony violation. (*Id.*) The Disciplinary Hearing was conducted on March 30, 2017, and Hearing Officer Stangl found Plaintiff guilty of a felony violation. (*Id.* at 53.) Stangl's finding of guilt was based on the Disciplinary Report and Investigative Reports.

On May 1, 2017, Plaintiff submitted an Inmate Letter to Deputy Warden McAdorey. (*Id.* at 62.) Plaintiff noted that he had filed an appeal of Stangl's finding of guilty and that Plaintiff had spoken to McAdorey in person, explaining that he has a medical condition, interstitial cystitis, for which he takes three separate medications. (*Id.*) Plaintiff stated that one of the medications he takes is Flexeril, which he takes specifically because he has "a hard time relaxing his bladder to urinate." (*Id.*) Plaintiff wrote that McAdorey had told Plaintiff to remind him in his appeal that they had a verbal conversation on that topic, but Plaintiff had not heard back and was concerned, "since it ha[d] been a while." (*Id.*) Plaintiff stated that he can urinate if he is left alone for 10 minutes in a day room and noted that officers could take him to a day room, where kitchen workers get strip-searched, and have Plaintiff strip-searched to make sure he had nothing hidden. (*Id.*) Plaintiff stated that

if he were given 10 minutes, he would be able to produce a full cup and that he was more than willing to provide any other test, such as blood or hair, at his own expense. (*Id.*)

On May 15, 2017, McAdorey sent Plaintiff an Inmate Letter Response, stating that he had answered Plaintiff's appeal in his favor "due to some cloudy wording by medical staff." (*Id.* at 63.) McAdorey noted that the decision stipulated that from that point forward, Plaintiff would need to follow the UA policy to the letter or request a catheter. (*Id.*)

### 2. February 24, 2018 Disciplinary Ticket

On February 24, 2018, Officer Hernandez submitted an Inmate Disciplinary Report against Plaintiff. (*Id.* at 55.) Hernandez stated that Plaintiff had failed to produce a sample after two hours, and CO II Morrison and Hernandez advised Plaintiff that if they opened the UA cup and he could not produce, he would be charged for the cup. (*Id.*) Plaintiff stated that he had a medical issue. (*Id.*) Hernandez's report stated that Plaintiff had told him and Officer Morrison that he could not produce a sample because officers were watching him and that he had a medical waiver and agreement with Deputy Warden McAdorey. (*Id.* at 56.) Lieutenant Gerlach verbally placed Plaintiff on report. (*Id.* at 55.) Officer Barraza investigated the charge and referred it to the Disciplinary Hearing Officer as a felony violation. (*Id.*)

On February 26, 2018, Barraza submitted an Inmate Discipline-Investigative Report that stated that Plaintiff was advised to return a completed witness statement within 48 hours. (*Id.* at 58.) Plaintiff completed an Inmate Discipline-Witness Request/Statement/Refusal, stating that he had a letter from McAdorey stating that Plaintiff needed to follow the UA policy "to the letter" or request a catheter. (*Id.* at 59.) Plaintiff stated that he had asked CO II Morrison for a catheter and had Morrison "get" Gerlach so that Plaintiff could tell Gerlach about the letter. (*Id.*) Morrison indicated on the Witness Statement that Plaintiff had requested a catheter and that Plaintiff did ask Morrison to get Gerlach to explain that he had a letter from McAdorey stating that Plaintiff had a waiver to use a catheter. (*Id.*)

| | |
|---|---|
| 1 | The Disciplinary Hearing was conducted on February 28, 2018.  (*Id.* at 60.) Hearing Officer Carpenter found Plaintiff guilty of a felony violation, based on the Disciplinary Report and because Plaintiff did not produce a UA. (*Id.*)  The same day, Plaintiff submitted an Appeal of Disciplinary Charge to CO IV Brookhart. (*Id.* at 61.)  In the Appeal, Plaintiff stated that he had interstitial cystitis, for which he takes medication daily. (*Id.*)  Plaintiff stated that he is unable to relax his bladder to urinate. (*Id.*)  He asserted that the disciplinary finding implies that it is his fault that the medical department refuses to provide catheters. (*Id.*)  Plaintiff contended this was not his fault, especially since McAdorey had written a letter authorizing Plaintiff to request a catheter. (*Id.*) |

The Disciplinary Hearing was conducted on February 28, 2018.  (*Id.* at 60.) Hearing Officer Carpenter found Plaintiff guilty of a felony violation, based on the Disciplinary Report and because Plaintiff did not produce a UA. (*Id.*)  The same day, Plaintiff submitted an Appeal of Disciplinary Charge to CO IV Brookhart. (*Id.* at 61.)  In the Appeal, Plaintiff stated that he had interstitial cystitis, for which he takes medication daily. (*Id.*)  Plaintiff stated that he is unable to relax his bladder to urinate. (*Id.*)  He asserted that the disciplinary finding implies that it is his fault that the medical department refuses to provide catheters. (*Id.*)  Plaintiff contended this was not his fault, especially since McAdorey had written a letter authorizing Plaintiff to request a catheter. (*Id.*)

On March 9, 2018, the Appeals Officer upheld the finding of guilt in a Decision of Appeal. (*Id.* at 64.)  The Decision stated that the Appeals Officer saw no due process issues in the case, noting that Plaintiff was given the opportunity to submit witness statements. (*Id.*)  The Decision further stated that Plaintiff's contention that he is not able to provide a urine sample was not supported by any documentation from medical staff, and his contention that he should have been catheterized to provide a sample is not allowed for by the drug-testing policy. (*Id.*)

On March 13, 2018, Plaintiff filed an Appeal of Disciplinary Charge. (*Id.* at 65.) Plaintiff reiterated that he has interstitial cystitis, for which he takes medication. (*Id.*) Plaintiff stated that he requested but was denied a catheter, which was not his fault, especially in light of McAdorey's letter. (*Id.*)  Plaintiff attached copies of his Inmate Letter to McAdorey and McAdorey's Inmate Letter Response.  (*Id.* at 66-67.)  The same day, CO III Barraza sent a Second-Level Disciplinary Appeal Package to the Disciplinary Appeals Officer. (*Id.* at 68.)  On March 21, 2018, the Central Office issued an Inmate Disciplinary Appeal Response Second Level. (*Id.* at 69.)  The Response stated that the issues raised in Plaintiff's narrative had been considered, but no due process error was found. (*Id.*)  The findings and recommended penalties were upheld, and the appeal was denied. (*Id.*)

. . . .

### 3. March 9, 2018 Disciplinary Ticket

On March 9, 2018, Sergeant Bouey wrote an Inmate Disciplinary Report against Plaintiff. (*Id.* at 71.) The Report stated that Plaintiff was given two hours and eight ounces of water to produce a sample, per policy, and Plaintiff failed to produce a sample within two hours. (*Id.*) Barraza investigated the charge and referred it to the Disciplinary Hearing Officer as a felony violation. (*Id.*) On March 12, 2018, Barraza completed an Inmate Discipline-Investigative Report that stated that no witnesses were requested, and no witness request statements were issued. (*Id.* at 72.) CO III Torres was assigned to assist Plaintiff with the charge. (*Id.* at 73.) On March 15, 2018, Plaintiff's Discipline Case was postponed to accommodate the Disciplinary Hearing Officer's schedule and to accommodate the Coordinator's schedule. (*Id.* at 74.)

The Disciplinary Hearing was conducted on March 22, 2018. (*Id.* at 75.) The Disciplinary Hearing Officer found Plaintiff guilty of a felony violation, based on the Disciplinary Report and Investigative Reports. (*Id.*) The same day, Plaintiff filed an Appeal of Disciplinary Charge. (*Id.* at 76.) Plaintiff stated that because of his interstitial cystitis, he is unable to provide a UA according to the policy. (*Id.*) Plaintiff asserted that the policy should, but does not, provide an alternative, such as a blood draw or a catheter. (*Id.*) Plaintiff claimed Barraza refused to contact medical staff, although Plaintiff had previously waived his confidentiality privilege to his medical information. (*Id.*) Plaintiff requested that medical staff be contacted to "verify the truth." (*Id.*) Plaintiff also noted that he was appealing the ticket "in order to exhaust [his] remedies." (*Id.*)

On April 17, 2018, Defendant Mattos submitted a Decision of Appeal. (*Id.* at 77.) The Decision stated that Mattos had reviewed Plaintiff's documents and had spoken to medical staff "concerning [Plaintiff's] supposed issue." (*Id.*) The Decision noted that medical staff had stated that Plaintiff "should have no issues" and that providing a urinalysis sample "was not a medical issue." (*Id.*) Mattos upheld the findings and denied the appeal. (*Id.*)

1  On April 18, 2018, Plaintiff submitted an Appeal of Disciplinary Charge. (*Id.* at
2  78.) Plaintiff asserted that for prisoners with disabilities, like Plaintiff, there should exist
3  a procedure to provide a urine sample through catheterization or to provide a blood sample.
4  (*Id.*) Plaintiff stated that such a procedure, which would enable him to prove he is drug-
5  free, does not exist and that he intended to challenge the policy in district court. (*Id.*)
6  Plaintiff asserted that the existing procedure was inadequate for prisoners, like him, who
7  have a disability. (*Id.*) On April 19, 2018, CO III Barraza submitted the Second-Level
8  Disciplinary Appeal Package to the Disciplinary Appeals Officer. (*Id.* at 79.) On May 7,
9  2018, the Central Office issued an Inmate Disciplinary Appeal Response Second Level.
10 (*Id.* at 80.) The Response stated that the record contained within the case file had been
11 reviewed, and the issues raised in Plaintiff's narrative had been considered, but no due
12 process error was found. (*Id.*) The findings and recommended penalties were upheld, and
13 the appeal was denied. (*Id.*)

### 4. April 21, 2018 Disciplinary Ticket

On April 21, 2018, Officer Murelli filed an Inmate Disciplinary Report against Plaintiff. (*Id.* at 82.) Murelli stated that on April 20, 2018, Plaintiff was randomly chosen for a UA, and "right from the beginning he stated that he was not going to produce a sample." (*Id.*) Murelli stated that he offered Plaintiff one eight-ounce cup of water and waited for two hours. (*Id.*) At the end of two hours, Murelli verbally placed Plaintiff on report. (*Id.*) Barraza investigated the charge and referred it to the Disciplinary Hearing Officer as a felony violation. (*Id.*) On April 24, 2018, Barraza completed an Inmate Discipline-Investigative Report that noted that Plaintiff had stated he was not guilty "due to disability." (*Id.* at 83.) The same day, Plaintiff signed an Inmate Discipline-Hearing Waiver, in which he waived his right to 48 hours' prior notice before the Disciplinary Hearing in order to "get it over with." (*Id.*)

The Disciplinary Hearing was conducted on April 26, 2018. (*Id.* at 86.) Plaintiff declined staff assistance. (*Id.*) The Disciplinary Hearing Officer found Plaintiff guilty of a felony violation, based on the Disciplinary Report and Investigative Reports. (*Id.*) The

same day, Plaintiff submitted an Appeal of Disciplinary Charge. (*Id.* at 87.) Plaintiff stated that he was appealing the ticket "on the same grounds as before": the prison policy is inadequate for a person with a disability to prove that he is drug-free by failing to provide alternative means of drug testing, such as catheterization, a blood draw, or a hair sample. (*Id.*) Plaintiff noted that on April 23, 2018, he had filed a Complaint in district court "asking them to resolve this issue." (*Id.*)

On May 4, 2018, Defendant Mattos issued a Decision of Appeal. (*Id.* at 88.) The Decision stated that Mattos had reviewed Plaintiff's case and saw "no issues with the due process [Plaintiff was] afforded." (*Id.*) The Decision stated that Plaintiff's contention that he should not have been found guilty based on a medical disability was not supported by any evidence. (*Id.*) Mattos upheld the finding of guilt and penalties and denied the appeal. (*Id.*) On May 8, 2018, Plaintiff submitted an Appeal of Disciplinary Charge, again arguing that the UA policy was inadequate for prisoners with disabilities. (*Id.* at 89.) On May 11, 2018, CO III Barraza submitted the Second-Level Disciplinary Appeal Package to the Disciplinary Appeals Officer. (*Id.* at 90.) On May 18, 2018, the Central Office issued an Inmate Disciplinary Appeal Response Second Level, denying Plaintiff's appeal. (*Id.* at 91.)

### D. ADC's Grievance Procedure

During the relevant time, DO 802, Inmate Grievance Procedure, sets forth the process that inmates are required to follow to properly complete and exhaust ADC's grievance procedure through the Director's Level for non-medical or "standard" grievances. (Doc. 17 ¶¶ 13-14.) For each ADC unit, a staff member, customarily a member of Programs (counseling), is designated by the Deputy Warden to serve as the institutional Grievance Coordinator. (*Id.* ¶ 15.) The Grievance Coordinator's duties and responsibilities include keeping records of grievances; accepting properly prepared grievances; returning improper grievances to inmates unprocessed with an explanation of the deficiency; assigning grievance case numbers; investigating grieved issues; responding to inmates; providing instructions on how to appeal; and accepting and forwarding grievance appeals and appeal responses. (*Id.*)

As part of their orientation, inmates are instructed on how to properly use the grievance procedure. (*Id.* ¶ 16.) A copy of the grievance policy is available for inmate use at the inmate resource center/library in each prison facility, and inmates may seek assistance in using the process from their assigned Correctional Officer ("CO") III. (*Id.*) The inmate grievance process may be used for "complaints related to any aspect of institutional life or condition of confinement which directly and personally affects the inmate grievant including Department Orders, Director's Instructions, Post Orders, Technical Manuals, and written instructions, procedures and the actions of staff." (*Id.* ¶ 17.)

Under DO 802, inmates must attempt to resolve all allowed grievance issues informally before submitting a formal grievance. (*Id.* ¶ 19.) If the inmate is unable to resolve a complaint through informal means, the inmate may submit an Informal Complaint on an Inmate Informal Complaint Resolution form to the CO III in the inmate's unit. The CO III investigates the informal complaint, attempts to resolve it informally, and provides a response to the inmate within 15 workdays of its receipt. (*Id.* ¶ 20.)

The inmate may submit a formal Inmate Grievance to the unit Grievance Coordinator within 5 workdays from the date the inmate receives the CO III's response to the inmate's informal complaint. (*Id.* ¶ 21.) An inmate may only file one complaint per grievance. (*Id.*) Within 15 workdays following receipt of the formal inmate grievance, the Deputy Warden issues a written response to the inmate. (*Id.*) Upon receipt of a proper Inmate Grievance, the Grievance Coordinator logs the grievance and assigns it a sequential number in the Unit Coordinator Grievance Log, Form 802-9. (*Id.* ¶ 22.) A formal Inmate Grievance that does not conform with the requirements set forth in DO 802 will be returned to the inmate unprocessed, with an explanation of the reason for returning it unprocessed. (*Id.* ¶ 23.) Grievance Coordinators maintain files of grievances which were returned to inmates unprocessed. (*Id.* ¶ 24.)

If the inmate receives an unfavorable response from the Deputy Warden, the inmate may appeal the response to the Director within 5 workdays of receipt of the formal inmate

grievance response from the Deputy Warden. (*Id.* ¶ 25.) An inmate may not file an appeal to the Director until the grievance procedure within the inmate's assigned unit and institution has been exhausted. (*Id.*) Within 30 calendar days, the Central Office Appeals Director must prepare a response and submit it to the Director or the Director's designee for signature. (*Id.* ¶ 26.) The Director's response is final and constitutes exhaustion of all remedies within ADC for standard grievances. (*Id.* ¶ 27.)

The Inmate Grievance Procedure does not serve as a duplicate appeal process or substitute appeal process for disciplinary matters. (*Id.* ¶ 34.) The disciplinary appeal process under DO 803 applies only to a subject disciplinary ticket and related procedure. (*Id.* ¶ 35.)

### E. Plaintiff's Grievances

Plaintiff filed three grievances between July 10, 2015 and November 1, 2018: in August 2017, March 2018, and June 2018. (*Id.* ¶ 28.) The grievances were categorized as "Health Care" (category 10) issues. (*Id.* ¶ 29.) None of the grievances referred to ADC policies, Department Orders, procedures, Institution Orders, actions of staff, or disciplinary matters. (*Id.*) Specifically, none of the grievances complained about "(a) policy or procedures related to urine testing for substance abuse, (b) an alleged inability to provide a urine sample within a two-hour timeframe resulting in disciplinary action; or (c) any type of request for an exemption for medical reasons from standard substance abuse urine testing procedures." (*Id.* ¶ 30.) Plaintiff did not initiate or complete any grievances during the relevant time concerning his inability to conform to standard testing procedures by producing a urine sample in the presence of a staff witness within a two-hour timeframe. (*Id.* ¶ 31.) Plaintiff did not submit any grievance appeal to the Director's level on any issue between July 10, 2015 and November 1, 2018. (*Id.* ¶ 37.)

## IV. Discussion

### A. Legal Standard for Exhaustion

Under the Prison Litigation Reform Act ("PLRA"), a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C.

§ 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If the defendants move for summary judgment for failure to exhaust and the evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies, it is appropriate for the court to grant summary judgment sua sponte for the nonmovant on the issue. *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment on issue of exhaustion, but because he would have succeeded had he made such a motion, sua sponte grant of summary judgment was appropriate).

### B. Parties' Contentions

Defendant argues that although Plaintiff appealed the disciplinary sanctions imposed against him for failing to provide a urine sample for drug testing, he never used ADC's inmate grievance procedure to seek an accommodation for his disability. (Doc. 16 at 1.) Defendant contends that Plaintiff never sought reprieve from the testing requirement

itself by using the grievance process. (*Id.* at 2.) Defendant asserts that the grievance process was available to Plaintiff, but he did not utilize or exhaust the grievance process with respect to his inability to provide a urine sample. (*Id.* at 4-5.)

Defendant also argues that none of Plaintiff's medical grievances concerned the urinalysis issue. (*Id.* at 5.) Defendant contends that Plaintiff's medical grievances "did not provide enough information to allow prison officials to take appropriate responsive measures." (*Id.*) Although Plaintiff complained about his bladder condition in all his medical grievances, he did not mention ADC's drug testing policy or claim that an inability to urinate would unjustly result in disciplinary sanctions. (*Id.* at 5-6.) Defendant asserts that nothing in Plaintiff's medical grievances seeking additional medication or an allergy diet could have put ADC on notice that its security protocols needed to be adjusted to accommodate Plaintiff's condition. (*Id.* at 6.)

Defendant further argues that DO 802 is not a substitute for the disciplinary appeals process, and the "corollary to this is that the disciplinary appeals process is not a substitute for the inmate grievance process." (*Id.*) That is, according to Defendant, an inmate cannot properly exhaust available administrative remedies by improperly pursuing relief through the wrong institutional mechanism. (*Id.*) Defendant contends that in using only the disciplinary process, Plaintiff deprived ADC "of a fair opportunity to consider his real grievance." (*Id.* at 7.) The disciplinary appeals process "simply does not allow for consideration of whether individual exceptions to policy are warranted for individual inmates." (*Id.*)

In response, Plaintiff argues that he exhausted administrative remedies three times. (Doc. 30 at 6.) Plaintiff asserts that on May 1, 2017, he "effectively commenced/used" the grievance process and obtained the relief he sought—that is, a waiver that permitted him to use a catheter to produce a urine sample—which obviated the need to further use the process. (*Id.*) Thus, Plaintiff argues that McAdorey's May 8, 2018 and May 15, 2017 written responses constituted a successful conclusion of the pre-ICR informal attempt to resolve the matter, in accordance with DO 802.02.1.1. (*Id.* at 7.) Plaintiff further contends

that he provided Director Ryan and Defendant Mattos with no fewer than three opportunities to address his claim for accommodation of his disability in his disciplinary appeals. (*Id.*) Plaintiff asserts that when McAdorey's directive to accommodate Plaintiff was not carried out by staff, Plaintiff repeatedly gave Mattos notice of the issue through three separate disciplinary proceedings. (*Id.*)

Plaintiff contends that his use of the disciplinary appeals process was the correct "institutional mechanism" to alert Mattos to Plaintiff's claim. (*Id.* at 10.) Plaintiff asserts that the current UA policy does not explicitly or implicitly prohibit use of a catheter to facilitate urination. (*Id.* at 11.) Rather, the policy only requires UA staff to visually observe the urine leaving the inmate's urethra and entering the container. (*Id.*) Plaintiff argues that throughout the disciplinary process, he reiterated that his disability prevented him from producing a urine sample and requested that he be allowed to use a catheter. (*Id.* at 12.) He contends that Mattos "passed on three opportunities to modify or dismiss the charges against Plaintiff" and instead threatened Plaintiff by telling him that UAs would continue every 30 days. (*Id.*)

**C.     Discussion**

Exhaustion requires complying with an agency's "critical procedural rules," and it is justified by the agency's need to "impos[e] some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). In addition to complying with the strict letter of the PLRA, requiring prisoners to exhaust administrative remedies serves other important objectives. Administrative appeals alert prison officials to "the nature of the wrong for which redress [was] sought," *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (citation and internal quotation marks omitted), allowing them to take corrective action where appropriate, *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016). Exhaustion also allows a prison's administration "to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007); *see also*

*Woodford*, 548 U.S. at 93-95 ("The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case" (alteration, citation, and internal quotation marks omitted).).

"The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *see also Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014). Considerable deference is owed to those who administer prison systems, and courts recognize that "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). In *Ross*, the Supreme Court explained that administrative procedures may be functionally unavailable if "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The Supreme Court concluded that the "available" remedies that must be exhausted are procedures that are "capable of use to obtain some relief for the action complained of." *Id.*

The Ninth Circuit has held that the particular circumstances of a prisoner's case must be considered when deciding whether administrative remedies were properly exhausted. *Fuqua v. Ryan*, 890 F.3d 838, 850 (9th Cir. 2018) (citing *Albino*, 747 F.3d at 1172). In *Fuqua*, the plaintiff did not exhaust remedies through the prison's standard grievance process; however, the Ninth Circuit determined that he exhausted his administrative remedies for his free-exercise claim through the prison's disciplinary process because he raised his religious beliefs as a defense to the disciplinary charge against him and the prison's policy stated that the disciplinary appeal process was the only method for challenging disciplinary convictions. *Id.* at 847–48. The Ninth Circuit noted that, "[w]ithout question, prevailing in his disciplinary appeal could have allowed [the prisoner] to obtain the relief he sought because it would have resulted in the expungement of his conviction and the resulting sanctions." *Id.* at 848. Under those circumstances, the

1  Ninth Circuit did not "hesitate to conclude" that ADC's expectation that the plaintiff would
2  exhaust his religious accommodation claim by pursuing a grievance pursuant to DO 802,
3  while simultaneously pursuing a DO 803 disciplinary appeal, was "precisely the sort of
4  'essentially unknowable' procedure that the *Ross* Court had in mind." *Id.* (quoting *Ross*,
5  136 S. Ct. at 1859.)

6  Here, like the plaintiff in *Fuqua*, Plaintiff "completed every step of the disciplinary
7  appeal process" and repeatedly requested accommodation for his disability. *Id.* at 850.
8  "There was nothing ambiguous" about Plaintiff's request for accommodation, and
9  Defendant was "clearly on notice of the relief he sought." *Id.* (citing *Griffin*, 557 F.3d at
10 112.) Thus, the Court concludes "the purposes of the PLRA exhaustion requirement have
11 been fully served." *Id.* (quoting *Reyes*, 810 F.3d at 658).

12 In addition, it does not appear that prison officials directed Plaintiff to the standard
13 grievance procedure for his request for accommodation for drug testing. *See id.* at 846
14 (noting that ADC Department Orders provide that a prisoner will be redirected to the
15 disciplinary hearing procedure if he improperly initiates a grievance related to a
16 disciplinary charge, but that if the prisoner attempts to pursue a disciplinary appeal for a
17 matter more appropriately addressed by a standard grievance, the Department Orders do
18 not require prison officials to redirect the prisoner to Department Order 802); *Brown*, 422
19 F.3d at 937 (evidence regarding whether remedies are available include official directives
20 that explain the scope of the administrative review process; in addition, "information
21 provided to the prisoner . . ., such as in the response memoranda . . . is pertinent because it
22 informs our determination of whether relief was, as a practical matter, 'available'").
23 Accordingly, the Court finds Plaintiff has met his burden to show that he exhausted
24 administrative remedies or to "come forward with evidence showing that there is
25 something in his particular case that made the existing and generally available
26 administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The
27 Court will therefore deny Defendant's Motion for Summary Judgment.
28 . . . .

**V. Motion to Amend Complaint**

In his Motion to Amend, Plaintiff requests that the Court grant him leave to amend his Complaint. Plaintiff asserts that in November 2018, Plaintiff received 845 pages of discovery, plus 124 pages of documents attached as exhibits to Defendant's Statement of Facts in Support of his Motion for Summary Judgment. Plaintiff states that after reviewing the documents, the Court's Orders, and the pleadings, Plaintiff seeks leave to amend the original Complaint. Specifically, Plaintiff seeks leave to allege additional facts concerning Director Ryan's personal involvement in the deprivation of Plaintiff's constitutional rights. Plaintiff also seeks to amend Count One to add facts, allegations, and a statement of injuries "conducive and reflective of an ADA cause of action."

Plaintiff notes that leave to amendment should be "freely given," and the Court must consider factors such as bad faith, undue delay, prejudice to the opposing party, and futility in determining whether to grant leave to amend. Plaintiff avers that he "can perceive no prejudice" to Defendant Mattos or Director Ryan. Plaintiff contends that Mattos's Motion for Summary Judgment raises no issues on the merits, but rather seeks summary judgment on the affirmative defense of failure to exhaust. Plaintiff states that he has not filed the First Amended Complaint to avert or evade the speedy disposition of the Motion for Summary Judgment. Plaintiff asserts that post-discovery motions to amend a complaint are "routine" and argues that the exhibits attached to his Response to the Motion for Summary Judgment and the "many medical related alterations reflected" in Count One of the proposed First Amended Complaint show that Plaintiff "has used much information gleaned from the discovery to correct errors in the operative facts of the cause of action in the original Complaint."

Finally, Plaintiff argues that his failure to exhaust his policy-related claims against Director Ryan was "excusable" under § 1997e(a), and the exhaustion defect that was present when he filed the original Complaint has been corrected, because he exhausted his administrative remedies in the interim between the original Complaint and his request for leave to amend.

Defendant Mattos states that, contrary to Plaintiff's suggestion, a cause of action must be exhausted before the case is commenced, not merely before the operative complaint is filed. Defendant contends that if summary judgment is granted, Plaintiff's Motion to Amend "will likely be denied as futile because the claims are unexhausted." Defendant states that if summary judgment is not granted, Plaintiff's Motion to Amend "will likely be unopposed because Defendant understands the liberality with which such motions are treated and can likely claim no prejudice given the early stage of this litigation."

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading only with the opposing party's written consent or the Court's leave. Fed. R. Civ. P. 15(a). Rule 15(a) also provides that the Court "should freely give leave when justice so requires." Although the decision to grant or deny a motion to amend is within the discretion of the district court, "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis,* 371 U.S. 178, 182 (1962). However, "[l]eave to amend need not be given if a complaint, as amended, is subject to dismissal." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989).

Courts must review motions to amend in light of the strong policy permitting amendment. *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th Cir. 1986). Factors that may justify denying a motion to amend are undue delay, bad faith or dilatory motive, futility of amendment, undue prejudice to the opposing party, and whether the plaintiff has previously amended. *Foman*, 371 U.S. at 182; *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

The Court finds that Plaintiff's Motion to Amend was not unduly delayed and was not made in bad faith or with dilatory motive. The Court further finds that Defendant, as he acknowledges, will not suffer undue prejudice if leave to amend is granted, and Defendant has indicated that he would not oppose amendment if summary judgment is denied. In addition, Plaintiff has not previously amended his Complaint. Finally, the Court

does not find that amendment would necessarily be futile.  For these reasons, the Court will grant the Motion and direct the Clerk of Court to file the lodged Amended Complaint.

**IT IS ORDERED:**

(1) Defendant's Motion for Summary Judgment (Doc. 16) is **denied**.

(2) Plaintiff's Motion to Amend (Doc. 34) is **granted**.

(3) The Clerk of Court **must file** the lodged Amended Complaint (Doc. 34-1).

(4) Defendant must respond to the Amended Complaint within the time provided under Rule 15(a) of the Federal Rules of Civil Procedure.

Dated this 31st day of July, 2019.

_____
Honorable Rosemary Márquez
United States District Judge